**LYONS v. REINECKE, Collector of Internal Revenue.**

(Circuit Court of Appeals, Seventh Circuit. December 11, 1925. Rehearing Denied January 15, 1926.)

No. 3600.

1. **Pleading ☞214(1)—On demurrer, facts stated in declaration taken as pleaded.**

On demurrer, facts stated in declaration are taken as pleaded.

2. **Evidence ☞29—Pleading ☞214(5)—Judicial notice taken of statutes; statement of law in declaration may be disregarded as mere conclusion.**

Court takes judicial notice of statutory provisions, and statement of law in declaration demurred to is mere conclusion, which may be disregarded, if erroneous.

3. **Municipal corporations ☞278(½)—Chicago board of local improvements not charged with duty of originating plans for improvements.**

Board of local improvements of city of Chicago is not charged with duty of originating plans for local improvements, under Cahill's Stat. Ill. 1921, c. 24, § 129.

4. **Eminent domain ☞168(2)—Condemnation proceedings by city of Chicago not under direction of board of local improvements.**

Proceedings for condemnation of property for street improvements in city of Chicago are not under direction of board of local improvements, nor is it authorized to employ persons to prepare assessment roll, in view of Cahill's Stat. Ill. 1921, c. 24, §§ 134-137.

5. **Internal revenue ☞38—Declaration in suit to recover income tax paid held too indefinite and uncertain.**

Declaration, in suit to recover amount of income tax paid under protest, on ground that income was received for services as instrumentality of state government *held* too indefinite and uncertain as to work plaintiff was employed to do and did, and whether it was such as to exempt money paid therefor from assessment.

6. **Pleading ☞34(4)—Pleadings construed most strongly against pleader.**

Pleadings are to be construed most strongly against pleader.

7. **Internal revenue ☞38—Burden on plaintiff, suing to recover income tax paid, to allege facts showing income not subject to tax.**

Burden was on plaintiff, suing to recover amount of income tax paid under protest, to set forth, by clear and unequivocal averments facts showing that money paid him was not subject to tax.

8. **Internal revenue ☞7—Compensation of real estate expert in condemnation proceedings by city held not exempt from income tax, as money received for services as instrumentality of state government.**

Compensation received by real estate expert for work incident to condemnation of property by city for street improvements *held* not exempt from federal income tax as money received for services as instrumentality of state government in performing its functions.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Action by Ernest H. Lyons against Mabel G. Reinecke, Collector of Internal Revenue. Demurrer to declaration sustained, and plaintiff brings error. Judgment affirmed.

Albert Fink, of Chicago, Ill., for plaintiff in error.

John R. Wheeler, of Washington, D. C., for defendant in error.

Before EVANS, PAGE, and ANDERSON, Circuit Judges.

PAGE, Circuit Judge. Plaintiff in error, called plaintiff, sues to recover money paid under protest as an income tax, claimed to have been illegally exacted from him for the year 1920. He states, as the basis of his claim, that the income received was for services as an "instrumentality of the government of the state of Illinois in carrying on and performing its functions of government." The question is: Is the declaration obnoxious to a general demurrer?

The declaration avers: That the Legislature of the state of Illinois, having the right to do so, created the city of Chicago and a board of local improvements therefor. That all streets and highways in the city of Chicago have been and are laid out, improved, and extended under the authority of the state Legislature. That the streets and highways in all cities of the state are established for the use of all of its inhabitants. That the board of local improvements of Chicago was created by the state Legislature, and is charged with the duty of originating plans for local improvements, including the establishment, etc., of streets, to be paid for by special assessments, levied upon the property benefited, or by taxation, or partly by special assessment and partly by general taxation. That proceedings to condemn property for local improvements are conducted under the direction of that board and that it is empowered by the Legislature (a) to employ all persons necessary to do work of condemning

property; (b) to estimate compensation for property damaged and not taken; (c) to institute proceedings to assess property benefited; (d) to prepare assessment rolls; (e) to specify amounts to be paid by general taxation; and (f) to aid in procuring approval of assessment rolls in the courts. That those so employed are to be paid out of taxes levied, assessed, and collected under the laws of Illinois. That said board's general plan of operation is (a) to pass a resolution directing the making of the improvement; (b) its engineer estimates costs; (c) to hold a public hearing; (d) to submit an ordinance therefor to the city council; (e) if and when the ordinance is passed, proceedings for confirmation of the assessment and condemnation are commenced in the courts; (f) if and when favorable judgment is had, contracts are entered into and persons are employed to do the necessary work, under the control and direction of the board. That prior to January 1, 1920, such proceedings were originated and an ordinance passed by the city council for improving and widening numerous streets. That 7,000 pieces of property, owned by 7,000 different persons, were to be condemned and taken, the gross value of which exceeded $65,000,000. That 100,000 separate pieces of property, specially benefited by the improvements, had to be valued. That the city passed an ordinance authorizing the sale of $28,600,000 in bonds, to pay the city's part of the cost of improvements. That, on recommendation of the finance committee of the city council of the city of Chicago, the city council passed an order authorizing the board "to employ the following for such periods of time during 1920 as may be necessary:" Then follows a list of a large number of experts, including, "real estate experts, 4, on the basis of 1 per cent. of the value of property and $50 per day for testifying in court on behalf of the city." That the cost was to be charged to appropriations thereafter made and the comptroller and treasurer were to pass pay rolls for the same, when approved by the president of the board. That before retaining services of certain experts, including the real estate experts, the board was required to have the approval of the finance committee.

It is alleged that the city council "ordered that the employment by the board of local improvements of * * * Ernest H. Lyons, real estate expert, at $50 per day * * * be and the same is hereby approved." It is averred: That prior to January, 1920, the chairman of the board employed plaintiff for a period of five years, and that such employment was confirmed by a letter to him from the chairman of the board, written a year and two months later, viz. March, 1921, which, by its terms, set out the following: (a) That he was employed for real estate work on certain streets (not named); (b) compensation to be on basis of appraisal; (c) instructed plaintiff to report to the board of local improvements; (d) employment was to be during the years 1920, 1921, 1922, 1923, and 1924; (e) as a regular employé of the department, plaintiff was expected to give his exclusive time to the work mentioned; (f) all reports, maps, plats, estimates and figures, compiled by him, were to be submitted to the president of the board and copies of the reports filed in the board's office. That plaintiff accepted the terms and commenced the performance of the services, and he performed the contract until the assessment and payment of the income tax. That during 1920 plaintiff received 1 per cent. of the appraised value of the property, amounting to $322,369.93 on account of that work, and on account of work to be done during the four remaining years. That that sum was paid out of the bonds sold to pay the city's part of the improvement. Then follow averments relating to the assessment, and its payment under protest, and the formalties observed by plaintiff as a basis of recovery, the sufficiency of which are not brought into question.

In South Carolina v. United States, 26 S. Ct. 110, 112, 199 U. S. 437, 451 (50 L. Ed. 261, 4 Ann. Cas. 737), plaintiff's general proposition is stated thus: "That which is implied is as much a part of the Constitution as that which is expressed. * * * Among those matters which are implied, though not expressed, is that the nation may not, in the exercise of its powers, prevent a state from discharging the ordinary functions of government. * * * "

In that case there is such a wide discussion of the proposition and citation of authorities that further discussion is unnecessary. The court there said: "To determine to what extent that implication will go we must turn to the condition of things at the time the Constitution was framed."

The extent of the implication is also there so fully considered that the only remaining question for us to consider is whether plaintiff's declaration shows that the taxation, taking a part of the money paid him, tended to prevent the state of Illinois from discharging its ordinary functions of government.

Plaintiff, in support of his contention, lays great stress on Atkin v. Kansas, 24 S. Ct. 124, 191 U. S. 207, 48 L. Ed. 148. That case involved the validity, under the Constitution of the United States, of the Kansas Eight-Hour Law of 1891 (Laws 1891, p. 192), and we are of opinion that it is unimportant here. The court said: "We rest our decision upon the broad ground that the work being of a public character, absolutely under the control of the state and its municipal agents acting by its authority, it is for the state to prescribe the conditions under which it will permit work of that kind to be done."

That is not at all the question here. Since the Illinois Constitution of 1870—excepting only certain provisions as to the city of Chicago (article 4, § 34)—the incorporation of cities, villages, and towns could and can be only under the general law. The general act of 1872 (Laws 1871–72, p. 218) has continued, though frequently amended, to the present time, and, in so far as we are here concerned, Chicago is under the general law. Provisions for many things not strictly governmental in their character have long been contained in the general act for the incorporation of cities and villages.

By article 9, § 9, of the Constitution of 1870, it is provided: "The General Assembly may vest the corporate authorities of cities, towns and villages with power to make local improvements by special assessment, or by special taxation of contiguous property, or otherwise. For all other corporate purposes, all municipal corporations may be vested with authority to assess and collect taxes; but such taxes shall be uniform in respect to persons and property, within the jurisdiction of the body imposing the same."

The Legislature, pursuant thereto, authorized cities, villages, and towns to make local improvements by special assessment, by special taxation of contiguous property, or by general taxation or otherwise, as they shall by ordinance prescribe. It appears from Cahill's Illinois Statutes of 1921, c. 24, § 123: "There shall be appointed * * * in the manner provided by law, or if no such method be provided then by appointment of the mayor, a commissioner of public works, a superintendent of streets, a superintendent of special assessments, a superintendent of sewers, and a city engineer."

It is further provided (section 126) : "No ordinance for any local improvements, to be paid wholly or in part by special assessment or special taxation, shall be considered or passed by the city council * * * unless the same shall first be recommended by the board of local improvements. * * * "

Section 127: "In cities * * * having a population of 100,000 or more, * * * there is hereby created a board of local improvements consisting of the superintendent of special assessments and five other members; such five members shall be nominated by the mayor * * * and no one of which except such superintendent of special assessments, shall be the head of any other department of the government of such city, or hold any other office or position therein."

Section 129: "All ordinances for local improvement to be paid for wholly or in part by special assessment or special taxation shall originate with the board of local improvements. Petitions for any such public improvements shall be addressed to said board. Said board shall have the power to originate a scheme for any local improvement, to be paid for by special assessment or special tax, either with or without a petition, and in either case shall adopt a resolution describing the proposed improvement. * * * "

It is further in that section provided that, if private property is to be taken or damaged, the resolution shall describe the property proposed to be taken and fix a day and hour for public hearing, and that the board shall require an estimate of the cost of such improvement (omitting land to be acquired) to be made in writing by the engineer of the board. After describing the notice that shall be sent, there follows: "If upon such hearing the board shall deem such improvement desirable, it shall adopt a resolution therefor and prepare and submit an ordinance therefor as hereinafter provided."

Section 130 provides what shall be done at the public hearing by way of changing, altering or modifying the extent, kind, character and estimated cost of the improvement, and: "If the said proposed improvement be not abandoned, the said board shall cause an ordinance to be prepared therefor, to be submitted to the council." And, further: "In cities of 100,000 inhabitants or over, when a remonstrance petition is filed by the owners of a majority of the frontage on the line of the proposed improvement with the board of local improvements within thirty (30) days after the public hearing thereon, said board shall thereupon stay all proceedings therein for one year from said date."

Section 131 provides that, with the ordinance, the board shall also send to the council its recommendation of such improvement.

Section 132 provides that with the ordinance and recommendation shall go an estimate of the cost of the improvement, when made in accordance with the prior sections. Section 134 provides that, when the improvement requires the taking or damaging of property, proceedings shall be taken as provided in sections 135 to 156. Section 135 provides that the ordinance for the improvement or some subsequent order shall direct a person named to file a petition in some court of record, "praying that steps may be taken to ascertain the just compensation to be made for private property to be taken or damaged for the improvement or purpose specified in such ordinance, and to ascertain what property will be benefited by such improvement, and the amount of such benefit."

Section 136 provides what the petition shall contain, and "upon the filing of the petition the court shall enter an order designating two competent persons as commissioners, to act with the superintendent of special assessments, * * * who shall investigate and report to the court the just compensation to be made to the respective owners of private property which shall be taken or damaged for the said improvement, and also what real estate will be benefited by such improvement and the amount of such benefits to each parcel. Neither shall be employés of the petitioning municipality and both shall be disinterested persons. They shall be allowed a fee for their services which shall be fixed by the court in advance * * * and may be taxed as costs and included in the amount to be assessed, provided, however, that in cities of this state having a population of 100,000 or more * * * the fee of said commissioners shall be paid by the city out of its general fund. * * *"

Section 137 provides, in detail, how the commissioners shall make investigation, prepare and file their report with the court, showing the description of the parts and parcels of property, the names and residences of the owners, values, damages, benefits, etc. Thereafter, until the establishment of the improvement by the judgment of the court, condemning the property and apportioning the assessment roll, which is the report filed by the commissioners, the whole proceeding is in and under the direction of the court and there is a trial before a jury.

[1-3] While the facts stated in a declaration are, upon demurrer, to be taken as pleaded, yet we take judicial notice of statutory provisions, and any statement of the law in the declaration is but a conclusion, and, if erroneous, may be disregarded. The allegation "that the said board of local improvements of the said city of Chicago was and is charged, under the said acts of the Legislature of the said state of Illinois, with the duty of originating plans for local improvements within the said city," is an erroneous conclusion of the pleader. There is no requirement in the statute that the board of local improvements shall originate any improvement. It "shall have the power to originate a scheme for any local improvement" is the language of the statute, and, while it has that power, the purpose and intention of the law seems to be to have schemes for local improvement by special assessment of benefits originate with the property owners, and, whether originated by the board or by the petition of the property owners, the whole theory is that it is of local concern, a local benefit, that may be stopped or postponed by a majority of the frontage involved.

[4] The allegation "that the proceedings for the condemnation of property under the laws of eminent domain needed for such street improvements are conducted under the direction of the said board of local improvements, pursuant to statute of the state of Illinois in that behalf enacted, and authority is given by the said acts of the said Legislature to the said board of local improvements to employ any and all persons necessary to do the work of acquiring property by condemnation, and to estimate the amounts necessary to compensate persons for property damaged and not taken, and to institute proceedings to assess special taxes upon property benefited by such improvements, and to prepare assessment rolls against property specially benefited by such improvements," is an erroneous statement of the law. The proceedings for condemnation are not under the direction of the board of local improvements. That is all done in a court of record, and the person who files a petition therefor is designated in the ordinance or by subsequent order of the city council. Neither is there, by law, either an express or an implied authority in the board of local improvements to employ persons for all the purposes alleged, as above set forth. The provisions of the law are that the assessment roll is to be made by the superintendent of special assessments and two other persons appointed by the court, after they are found to be competent, and "neither shall be employés of the petitioning municipality and both shall be disinterested persons."

There is the further allegation "that the improvement of said streets * * * involve a total expenditure of over $75,000,000; that the work necessary to be done in and about the carrying out of said ordinance and the making of said improvements under the provisions of the laws of said state of Illinois involved, among other things, the following: * * * The preparation of assessment rolls, accurately setting out a description of each piece of property involved," etc. If that allegation and the connected allegations have any place in the declaration, they must have the purpose of leading readers of the declaration to understand that those things were part of the work plaintiff was employed to do, but the making of the assessment roll and the other matters outlined in that averment are things to be done by the court commissioners under the direction of the court.

[5] All of the work preceding the filing of the petition for condemnation in the court of record was done and the ordinance passed prior to January 1, 1920, yet the declaration shows that the first recommendation of the finance committee, upon which the general order of the city council was later predicated for the employment of plaintiff, was not made until February 5, 1920, so that plaintiff's employment could not have related to work done before passage of the ordinance. There is no allegation or other thing to show that either the report of the finance committee or the order of the council had anything whatever to do with the improvements on Ogden and other avenues, which, it is alleged, were covered by the ordinance.

Directly following the alleged order, imposing the obligation upon the board of local improvements to secure the approval of the committee on finance, is the following: "And be it further ordered that the employment by the board of local improvements of * * * Ernest H. Lyons" [plaintiff], real estate experts, at $50 per day, * * * be and the same is hereby approved." There is nothing to show, by averment or otherwise, that that order was made in connection with the improvements in question. Despite the fact that those orders were made in February, plaintiff alleges, in the next paragraph, that after numerous conferences he was, at a final conference prior to the 1st day of January, 1920, employed by the chairman of the board of local improvements, and further says that on March 2, 1921, a year and two months after he says he was employed, and after he

had been paid $322,369.93, "such employment was confirmed in a letter written by the chairman of the board of local improvements to plaintiff."

The letter, as averred, recites: "In compliance with this ordinance * * * I am now instructing you to report to this department for work at the compensation fixed by the council, with the understanding that you will remain in the employ of the city during the years 1920, 1921, 1922, 1923, and 1924." The order, averred in the declaration, did not authorize the employment of the plaintiff or anybody else for five years, but, preceding a list of those to be employed, it said: "To employ the following for such periods of time during 1920 as may be necessary." Further, the letter, written a year and two months after it is said the contract was made, and after the work had been done and the money paid, said: "The commencement of your activities in the city's employment will be deemed as acceptance of the conditions named in this letter."

[6, 7] All pleadings are to be construed most strongly against the pleader, and the burden was upon the plaintiff in this case, by clear and unequivocal averments, to set forth such facts as would show that the money paid him was not subject to the assessment made. The declaration is so indefinite and uncertain that it fails to show what work he was employed to do, what work he did do for the money received, or whether his employment was such as to bring him within or leave him without the protection of the rule under consideration.

[8] There yet remains for consideration the question as to whether, without regard to the indefiniteness and uncertainties in the averments, any cause of action on any theory is stated. In South Carolina v. United States, supra, after discussing the question hereinbefore adverted to, the court said (page 459 [26 S. Ct. 115]): "It is also worthy of remark that the cases in which the invalidity of a federal tax has been affirmed were those in which the tax was attempted to be levied upon property belonging to the state, or one of its municipalities, or was a charge upon the means and instrumentalities employed by the state, in the discharge of its ordinary functions as a government."

Then, after a review of many cases in the Supreme Court and in various other courts, not including the state of Illinois, the court concludes (page 463 [26 S. Ct. 117]): "Now, if it be well established, as these authorities

say, that there is a clear distinction as respects responsibility for negligence between the powers granted to a corporation for governmental purposes and those in aid of private business, a like distinction may be recognized when we are asked to limit the full power of imposing excises granted to the national government by an implied inability to impede or embarrass a state in the discharge of its functions. It is reasonable to hold that while the former may do nothing by taxation in any form to prevent the full discharge by the latter of its governmental functions, yet whenever a state engages in a business which is of a private nature, that business is not withdrawn from the taxing power of the nation."

In City of Chicago v. Seben, 46 N. E. 244, 245, 165 Ill. 371, 377 (56 Am. St. Rep. 245) the court said: "It is well settled that municipal corporations have certain powers which are discretionary or judicial in character, and certain powers which are ministerial. The powers of such corporations have also been divided into those which embrace governmental duties, such as are delegated to the municipality by the Legislature, and in the exercise of which the municipality is an agent of the state, and those powers which embrace quasi private or corporate duties, exercised for the advantage of the municipal locality and its inhabitants. Municipal corporations will not be held liable in damages for the manner in which they exercise, in good faith, their discretionary powers of a public, or legislative, or quasi judicial character. But they are liable to actions for damages when their duties cease to be judicial in their nature, and become ministerial. 2 Dillon on Mun. Corp. §§ 949, 832; Tiedeman on Mun. Corp. § 324. * * * A corporation acts judicially, or exercises discretion, when it selects and adopts a plan in the making of public improvements, such as constructing sewers or drains; but as soon as it begins to carry out that plan, it acts ministerially, and is bound to see that the work is done in a reasonably safe and skillful manner. * * * It has been said that the work of constructing gutters, drains and sewers is ministerial, and that the corporation is responsible in civil actions for damages caused by the careless or unskillful manner of performing the work. * * * It is the duty of a municipal corporation, which exercises its power of building sewers, to keep such sewers in good repair, and such duty is not discretionary, but purely ministerial. * * * The adoption of a general plan of sewerage involves the performance of a duty of a quasi judicial character, but the construction and regulation of sewers and the keeping of them in repair, after the adoption of such general plan, are ministerial duties, and the municipality, which constructs and owns such sewers, is liable for the negligent performance of such duties. [See cases cited.] * * * It has always been the doctrine of this court that, while the legal obligation of the city to construct gutters and grade and pave streets is one voluntarily assumed, yet that, when the city constructs these improvements for the benefit of the public, it then becomes the duty of the city to see that they are kept in repair [citing cases]."

In Johnston v. City of Chicago, 101 N. E. 962, 258 Ill. 494, 45 L. R. A. (N. S.) 1167, Ann. Cas. 1914B, 339, the court said: "In considering the question of liability the authorities usually hold that it must be considered that a municipality acts in a dual capacity—first, in exercising its governmental functions; and, second, as a private corporation, enjoying powers and privileges conferred for its own benefit. When such municipal corporation is acting within its authority, in a ministerial character, in the management of its property, it is liable for the negligent acts of its employees although the work in which they are engaged will inure to the benefit of the municipality. On the other hand, whether the municipality is exercising judicial, discretionary or legislative authority conferred by its charter, or is discharging a duty imposed solely for the benefit of the public, it incurs no liability for the negligence of its officers. 2 Cooley on Torts (3d Ed.) 1014; City of Chicago v. Seben [46 N. E. 244], 165 Ill. 371 [56 Am. St. Rep. 245]; 20 Am. & Eng. Ency. of Law (2d Ed.) 1197; Tiedeman on Mun. Corp. §§ 338, 349. The mere fact that a particular work may incidentally benefit the public does not necessarily exempt the city for torts committed by its employees. 20 Am. & Eng. Ency. of Law (2d Ed.) 1196. Official action is judicial where it is the result of judgment or discretion. It is ministerial when it is absolute, certain and imperative, involving merely the execution of a set task, and when the law which imposes it prescribes and defines the time, mode, and occasion of its performance with such certainty that nothing remains for judgment or discretion. A municipal corporation acts judicially, or exercises discre-

tion, when it selects and adopts a plan in the making of public improvements; but, as soon as it begins to carry out that plan, it acts ministerially, and is bound to see that the work is done in a reasonably safe and skillful manner. City of Chicago v. Seben, supra; 4 Dillon on Mun. Corp. (5th Ed.) § 1741. * * * The organization of this public library is for the exclusive benefit of the territory of the city of Chicago, and not for the state at large. It has been organized by the people of that city, through their proper representatives, voluntarily, and the duties to be performed have not been thrust upon the people of said city nolens volens. Even a municipality, usually considered a quasi corporation, when voluntarily organized, has been held by this court responsible for certain negligent acts of its employees. Bradbury v. Vandalia Drainage District [86 N. E. 163], 236 Ill. 36 [19 L. R. A. (N. S.) 991, 15 Ann. Cas. 904]; 20 Am. & Eng. Ency of Law (2d Ed.) 1196. When a city, under no obligation to light its streets, voluntarily undertakes to do so, it has been held liable for negligence in the management of its corporate property when used for such purpose. Dickinson v. Boston [75 N. E. 68], 188 Mass. 595 [1 L. R. A. (N. S.) 664]. The doctrine of this court has always been that, while the legal obligation to pave streets is one voluntarily assumed by the municipal authorities, yet when the city constructs these improvements for the benefit of the public it then becomes its duty to keep them in repair."

In Stedwell v. City of Chicago, 130 N. E. 727, 730, 297 Ill. 486, 488 (17 A. L. R. 829), the court said: "Plaintiff in error contends that in lighting its streets it was exercising its governmental function, and therefore not liable to any one injured by coming in contact with wires used for that purpose. The point is conclusively settled contrary to the contention of plaintiff in error. Johnston v. City of Chicago [101 N. E. 960], 258 Ill. 494 [45 L. R. A. (N. S.) 1167, Ann. Cas. 1914B, 339]; Dickinson v. Boston [75 N. E. 68], 188 Mass. 595 [1 L. R. A. (N. S.) 664]; Davoust v. City of Alameda [84 P. 760, 149 Cal. 69], 5 L. R. A. (N. S.) 536 [9 Ann. Cas. 847]; Fisher v. City of New Bern [53 S. E. 342, 140 N. C. 506], 5 L. R. A. (N. S.) 542 [111 Am. St. Rep. 857]; 19 R. C. L. 1132." See, also, Hanrahan v. City of Chicago, 289 Ill. 400, 404, 124 N. E. 547.

The judgment of the court, in sustaining the demurrer to the declaration, is affirmed.