GARY GAPINSKE *et al.*, Indiv. and as Special Adm'rs of the Estate of Adam Paul Gapinske, Plaintiffs-Appellants, v. THE TOWN OF CONDIT *et al.*, Defendants-Appellees.

Fourth District   No. 4—92—0840

Argued April 13, 1993.—Opinion filed September 16, 1993.— Rehearing denied October 13, 1993.

COOK, J., specially concurring.
LUND, J., dissenting.

Bruce A. Brown (argued), of Goldsmith, Thelin, Schiller, Dickson & Brown, of Aurora, and Brian McPheters (argued), of Hatch, Blockman, McPheters, Fehrenbacher & Lyke, of Champaign, for appellants.

Jay S. Judge (argued), Kristine A. Karlin, and Steven A. Kozicki, all of Judge & James, Ltd., of Park Ridge, for appellees.

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

On the night of December 29, 1990, plaintiffs Gary and Jane Gapinske drove south on a township road, which was a borderline between the Town of Condit and the Town of Newcomb, both in Cham-

paign County. As they crossed a bridge over the Sangamon River, they drove into floodwater on the roadway. The floodwater swept their car into the river, but both plaintiffs escaped from the car and grabbed onto some tree limbs to keep from being swept away. At the time of this incident, Jane Gapinske was 7½ months pregnant. Both she and Gary survived, but both suffered from hypothermia, which caused the death of Jane's unborn child.

When plaintiffs drove into the floodwater, a yellow flashing light had been placed at the side of the road just ahead of the floodwater. In August 1991, plaintiffs brought this action against the two towns and both of the towns' road commissioners, alleging *inter alia* that defendants' conduct constituted negligence or wilful and wanton behavior for the following reasons:

(a) defendants failed to put the warning device far enough in advance of the flooding river to enable southbound drivers approaching the bridge from the north to stop in time to avoid driving into the river;

(b) defendants permitted the warning device or barricade on the northerly approach to the bridge to be moved (or removed) and to remain in the wrong location (or to remain absent) when they knew (or should have known) that the absence of such warning signs created a dangerous condition for motorists going south on the road at the bridge;

(c) defendants failed to properly maintain, replace, or position the warning device or barricades immediately north of the flooding river;

(d) defendants failed to provide a warning sign or barricade on the northerly approach to the bridge, in addition to the flashing light, to alert drivers of the flooding, when flooding would not be reasonably apparent to motorists;

(e) defendants failed to provide barricades or warning signs on the northerly approach to the bridge far enough in advance of the flooding river, when similar warnings had earlier been placed on the southerly approach to the bridge;

(f) defendants failed to close the road in the area of the bridge, when defendants had closed the road to northbound traffic;

(g) defendants failed to warn southbound traffic that the road was closed, when defendants had posted such warnings at the intersection for northbound motorists;

(h) defendants failed to post a warning device conforming to the Manual on Uniform Traffic Control Devices (1988) (Uniform Manual) for southbound motorists;

(i) defendants failed to give an adequate warning of the flooded road to southbound motorists, in that the flashing light was located off the roadway, low to the ground, and was a device customarily used to mark holes in highways or lateral boundaries of roadways and was therefore ambiguous as to its intent and purpose; and

(j) defendants failed to give adequate warning to southbound motorists, in that the flashing light failed to conform to section 6B—3 of the Uniform Manual (Uniform Manual §6B—3, at 6B—2 (warning devices should be placed in a position where they will convey their message most effectively and drivers will have adequate time for a response)) and failed to accompany the light with a sign warning of the flooded roadway as required by section 2C—40 of the Uniform Manual (Uniform Manual §2C—40, at 2C—22).

Defendants moved to dismiss, based in part upon a claim of immunity under the Local Governmental and Governmental Employees Tort Immunity Act (Act) (Ill. Rev. Stat. 1991, ch. 85, par. 1—101 *et seq.*). In September 1992, the trial court dismissed plaintiffs' complaints with prejudice. However, the court stated that it believed the allegations of the complaint, taken as true, avoided the immunity granted defendants under section 3—104 of the Act (Ill. Rev. Stat. 1991, ch. 85, par. 3—104). The court granted defendants' motion to dismiss anyway, holding that the Uniform Manual did not impose any mandatory requirements because compliance therewith constitutes discretionary acts by defendants. The court also found that section 3—105 of the Act (Ill. Rev. Stat. 1991, ch. 85, par. 3—105) provided immunity to defendants because the duty to maintain did not include the duty to warn because of weather conditions. The court also ruled that the flood itself, and not the yellow flashing light, was the proximate cause of the accident. Last, the court found plaintiffs' complaint did not rely upon their observing any signs or warning devices.

On appeal, defendants renew all of their previously stated grounds for dismissal. Because we agree with defendants' claim that section 3—104 of the Act grants them immunity, we affirm the dismissal of plaintiffs' complaint and need not discuss the other issues addressed by the trial court.

Throughout this litigation, defendants have maintained that the supreme court's decision in *West v. Kirkham* (1992), 147 Ill. 2d 1, 588 N.E.2d 1104, construing section 3—104 of the Act, disposes of this case because defendants are immune from any legal cause of action based upon their alleged failure to provide regulatory devices. To put defendants' argument and plaintiffs' response in context, we must dis-

cuss the legislative history of section 3—104 of the Act, as did the supreme court in *West*.

■ Section 3—104 of the Act was last amended in 1986, and prior to that amendment, it read as follows:

"(a) Neither a local public entity nor a public employee is liable under this Act for an injury caused by the failure to initially provide regulatory traffic control devices, stop signs, yield right-of-way signs, speed restriction signs, distinctive roadway markings or any other traffic regulating signs.

(b) Neither a local public entity nor a public employee is liable under this Act for an injury caused by the failure to provide traffic warning signals, signs, markings or other devices unless such a signal, sign, marking or device was necessary to warn of a condition which endangered the safe movement of traffic, and which would not be reasonably apparent to or anticipated by a person in the exercise of due care." (Ill. Rev. Stat. 1985, ch. 85, par. 3—104.)

The 1986 amendment deleted subsection (b) in its entirety and added "warning sign, device or marking," among others, to the list of traffic devices a municipality was immunized for failing to provide. (See Pub. Act 84—1431, art. 1, §2, eff. November 25, 1986 (1986 Ill. Laws 3740, 3744).) The supreme court in *West* spoke of this 1986 amendment as follows: "The legislature thus clearly intended to enlarge the scope of section 3—104's immunity and to immunize *absolutely* the failure to initially provide a traffic control device, even where such failure might 'endanger the safe movement of traffic.' " (Emphasis in original.) *West*, 147 Ill. 2d at 8, 588 N.E.2d at 1108.

As a result of the 1986 amendment (Pub. Act 84—1431), section 3—104 of the Act now reads as follows:

"Neither a local public entity nor a public employee is liable under this Act for an injury caused by the failure to *initially* provide regulatory traffic control devices, stop signs, yield right-of-way signs, speed restriction signs, distinctive roadway markings or any other traffic regulating or warning sign, device or marking, signs, overhead lights, traffic separating or restraining devices or barriers." (Emphasis added.) (Ill. Rev. Stat. 1991, ch. 85, par. 3—104.)

We emphasize the word "initially" in the above quotation because that word is the focus of plaintiffs' argument that section 3—104 of the Act does not provide immunity to defendants. Plaintiffs argue that because

"the [d]efendants did *initially* place a warning device for [s]outhbound motorists on [the road in question], the immunity provided in [s]ection 3—104 [of the Act] was not applicable. Therefore, logically, the [d]efendants would still have a duty to place the warning sign in accord with Ch. 95½, [s]ection 11—304, which incorporates the rules of the Illinois Manual on Uniform Traffic Control Devices." (Emphasis added.)

We disagree with plaintiffs that defendants' doing anything *initially* in this case deprived them of their immunity under section 3—104 of the Act.

■ Plaintiffs claim that the supreme court in *West* emphasized the importance of the word "initially" when that court referred to section 3—104's language regarding the " 'failure to initially provide.' " (Emphasis omitted.) (*West*, 147 Ill. 2d at 5, 588 N.E.2d at 1106.) We disagree that the word "initially" in that phrase possesses the significance plaintiffs claim. Instead, we conclude that a proper construction of section 3—104 of the Act since its 1986 amendment requires that the word "initially" simply be read out of the statute.

As previously shown, section 3—104 of the Act had two subsections, (a) and (b), prior to the 1986 amendment. Each subsection addressed different concerns. The reference in subsection (a) to "initial" acts by a local public entity was a statutory device to distinguish the acts that subsection (a) covered from those acts covered by subsection (b). Subsection (b) covered "later" acts (even though the word "later" was not in fact used). The "later acts" subsection (b) addressed were the development of a "condition which endangered the safe movement of traffic, and which would not be reasonably apparent to or anticipated by a person in the exercise of due care." (Ill. Rev. Stat. 1985, ch. 85, par. 3—104(b).) The legislature's 1986 deletion of subsection (b) in its entirety stripped the word "initially" of any meaning, and we view its continued presence in the statute (the old subsection (a)) as simply a legislative oversight.

To clear up any confusion regarding this matter, we now specifically reject plaintiffs' argument that the word "initially" in section 3—104 is somehow a limiting provision. To hold otherwise would, as the supreme court wrote in *West*, amount to finding an exception that "would effectively swallow the section's immunity entirely." *West*, 147 Ill. 2d at 10, 588 N.E.2d at 1108.

In support of this conclusion, we note that when the supreme court emphasized the word "initially" in *West* (see *West*, 147 Ill. 2d at 5, 588 N.E.2d at 1106), it did so merely because that word appears in the midst of the other key words in the section, namely, "failure to

provide." In later discussions in *West* concerning section 3—104 of the Act, the supreme court left out the word "initially" when explaining the statute. For instance, in *West* (147 Ill. 2d at 7, 588 N.E.2d at 1107), the court wrote the following: "Rather, section 3—104 clearly and unequivocally states that the municipality is *immune* from all liability arising out of the failure to provide a particular traffic control device." (Emphasis in original.) Further, in *West* (147 Ill. 2d at 12, 588 N.E.2d at 1109) the court stated: "The legislature [sought to avoid this undesirable result] by enacting section 3—104 and expressly immunizing the failure to provide a traffic control device or sign." While one could conclude that the supreme court inadvertently omitted the word "initially" from each of the above quotations, we conclude that the court realized that the word "initially" added nothing to its desired holding.

Plaintiffs' final claim is that defendants' placement of the flashing yellow light constituted wilful and wanton misconduct. We need not resolve that claim because we hold that section 3—104 of the Act immunizes not only negligent conduct, but also wilful and wanton conduct. We base this holding on (1) the absence of any language in section 3—104 of the Act indicating that the immunity it provides should be limited to negligent conduct, as opposed to wilful and wanton conduct, and (2) the legislature's demonstrated ability to provide such limiting language *when it intends to do so*. Indeed, we need look no further than two sections away (section 3—106) in the same Act to see where the legislature provides immunity to public entities and employees for certain kinds of recreational injuries *"unless such local entity or public employee is guilty of willful and wanton conduct proximately causing such injury."* (Emphasis added.) (Ill. Rev. Stat. 1991, ch. 85, par. 3—106.) In support of this holding, we again quote the supreme court in *West* that "section 3—104 clearly and unequivocally states that the municipality is *immune* from all liability arising out of the failure to provide a particular traffic control device." (Emphasis in original.) *West*, 147 Ill. 2d at 7, 588 N.E.2d at 1107.

For the reasons stated, we affirm the trial court's order dismissing plaintiffs' complaint.

Affirmed.

JUSTICE COOK, specially concurring:
I am not certain the use of the word "initially" in section 3—104 of the Act was a legislative oversight. (Ill. Rev. Stat. 1991, ch. 85, par. 3—104.) The word may be used to distinguish between the failure

to initially provide a sign, for which there is immunity, and the failure to replace a damaged or stolen sign, for which there may be liability under the town's duty to maintain its property. (Ill. Rev. Stat. 1991, ch. 85, par. 3—102(a); *West*, 147 Ill. 2d at 13-14, 588 N.E.2d at 1110.) The argument that once the town initially provided a sign of some sort the immunity was waived was rejected in *West*. "The creative plaintiff, seeking to premise an action on the failure to provide a particular traffic device, could always circumvent section 3—104 by finding and pointing out some *other* traffic device that *was* provided." (Emphasis in original.) *West*, 147 Ill. 2d at 10, 588 N.E.2d at 1108.

JUSTICE LUND, dissenting:
I respectfully disagree with the majority opinion. Section 3—104 of the Act must be read together with section 3—102(a) of the Act, which provides:

"Except as otherwise provided in this Article, a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity intended and permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used, and shall not be liable for injury unless it is proven that it has actual or constructive notice of the existence of such a condition that is not reasonably safe in reasonably adequate time prior to an injury to have taken measures to remedy or protect against such condition." Ill. Rev. Stat. 1991, ch. 85, par. 3—102(a).

Together with this provision is "the traditional rule that local governments have an obligation to maintain public property in a reasonably safe condition." (*Curtis v. County of Cook* (1983), 98 Ill. 2d 158, 163, 456 N.E.2d 116, 119.) The duty to maintain governmental property does not require the creation of public improvements. (*Horrell v. City of Chicago* (1986), 145 Ill. App. 3d 428, 432, 495 N.E.2d 1259, 1262.) The duty to maintain does not commence until an improvement is actually undertaken. (*Deren v. City of Carbondale* (1973), 13 Ill. App. 3d 473, 478, 300 N.E.2d 590, 593; *Horrell*, 145 Ill. App. 3d at 432, 495 N.E.2d at 1262; *Bowen v. City of Harvey* (1987), 164 Ill. App. 3d 637, 639, 518 N.E.2d 203, 205.) "A township has no common law duty to *** erect signs ***. A duty only arises when a public improvement is actually undertaken." *Havens v. Harris Township* (1988), 175 Ill. App. 3d 768, 771, 530 N.E.2d 284, 285.

In *Baran v. City of Chicago Heights* (1969), 43 Ill. 2d 177, 180-81, 251 N.E.2d 227, 229, our supreme court said:

"We cannot accept the argument. The court has long recognized that where a city undertakes to provide lights, it is liable for injuries which result from deficient or inadequate ones. (*Johnston v. City of East Moline*, 405 Ill. 460; *City of Chicago v. Powers*, 42 Ill. 169; *City of Freeport v. Isbell*, 83 Ill. 440.) In holding a city responsible for injuries thus caused the court is not reviewing the city's discretion in selecting a plan. It is not controlling or passing upon the city's estimate of public needs. Nor is it deciding what the 'best' kind of improvement may be. It is simply saying that when a city creates a hazardous condition and someone is injured as a consequence it must respond in damages, just as others are required to do. Such is in no sense usurping a legislative power, as suggested by defendant. A municipal corporation, like an individual or a private corporation, is required to exercise its rights and powers with such precautions as shall not subject others to injury. The rule which protects it in the exercise of its governmental functions should not be construed to relieve from liability when the plan devised, if put in operation, leaves the city's streets in a dangerous condition for public use. (*City of Chicago v. Seben*, 165 Ill. 371.) After a careful review of the record in the case at bar we think that the evidence of negligence was sufficient to justify the circuit court in refusing to direct a verdict."

One of the main issues on appeal in the present case is whether section 3—104 of the Act did create immunity. Because the dismissal was based upon the pleadings, we must take all well-pleaded facts in plaintiffs' complaint as true. (*Wolfe v. Wolfe* (1980), 81 Ill. App. 3d 833, 401 N.E.2d 1111.) Plaintiffs' complaint alleged the following as negligent and as wilful and wanton acts and/or omissions by the defendants:

(a) failed to put the warning device far enough in advance of the flooding river to enable southbound drivers approaching the bridge from the north to stop in time to avoid driving into the river;

(b) permitted the warning device or barricade on the northerly approach to the bridge to be moved (or removed) and to remain in the wrong location (or to remain absent) when they knew (or should have known) that the absence of such warning signs created a dan-

gerous condition for motorists going south on the road at the bridge;

(c) failed to properly maintain, replace, or position the warning device or barricades immediately north of the flooding river;

(d) failed to provide a warning sign or barricade on the northerly approach to the bridge, in addition to the flashing light, to alert drivers of the flooding, when flooding would not be reasonably apparent to motorists;

(e) failed to provide barricades or warning signs on the northerly approach to the bridge far enough in advance of the flooding river, when similar warnings had earlier been placed on the southerly approach to the bridge;

(f) failed to close the road in the area of the bridge, when defendants had closed the road to northbound traffic;

(g) failed to warn southbound traffic that the road was closed, when defendants had posted such warnings at the intersection for northbound motorists;

(h) failed to post a warning device conforming to the Uniform Manual for southbound motorists;

(i) failed to give an adequate warning of the flooded road to southbound motorists, in that the flashing light was located off the roadway, low to the ground, and was a device customarily used to mark holes in highways or lateral boundaries of roadways and was therefore ambiguous as to its intent and purpose; and

(j) failed to give adequate warning to southbound motorists, in that the flashing light failed to conform to section 6B—3 of the Uniform Manual (Uniform Manual §6B—3, at 6B—2 (warning devices should be placed in a position where they will convey their message most effectively and drivers will have adequate time for a response)) and failed to accompany the light with a sign warning of the flooded roadway as required by section 2C—40 of the Uniform Manual (Uniform Manual §2C—40, at 2C—22).

I agree that if none of the devices as listed in section 3—104 of the Act had been installed, then section 3—104 immunity would control. However, what is the effect of the installation of the yellow flashing device? I suggest that placing of the flashing warning light removed the section 3—104 immunity, or at least created a fact question as to the existence of negligent installation.

### SECTION 3—105 IMMUNITY

Section 3—105(a) immunity relates to "effect of weather conditions." (Ill. Rev. Stat. 1991, ch. 85, par. 3—105(a).) Section 3—

105(c) provides that "[n]othing in this Section shall relieve the local public entity of the duty to exercise ordinary care in the maintenance of its property as set forth in Section 3—102." Ill. Rev. Stat. 1991, ch. 85, par. 3—105(c).

Case law previously cited provides that once a governmental body undertakes to provide a warning or traffic device, immunity does not exist for failing to use ordinary care. This rule should equally apply to sections 3—104 and 3—105 of the Act.

## PROXIMATE CAUSE

The trial court, in dismissing plaintiffs' complaint, indicated the only proximate cause was the flooding. Proximate cause is defined as that cause which produces an injury through a natural and continuous sequence of events, unbroken by any effective intervening cause. (*Durbin v. St. Louis Slag Products Co.* (1990), 206 Ill. App. 3d 340, 356-57, 564 N.E.2d 242, 253.) In addition, there may be more than one proximate cause of an injury. (*Ray v. Cock Robin, Inc.* (1974), 57 Ill. 2d 19, 23, 310 N.E.2d 9, 11-12; *Bentley v. Saunemin Township* (1980), 83 Ill. 2d 10, 17, 413 N.E.2d 1242, 1246.) Plaintiffs alleged in their complaint that at the time of the accident the asphalt road was dark and there were no lights in the area. They also alleged the bridge angled to the east for southbound motorists, thereby reducing or eliminating a driver's ability to see the flood conditions in time to stop a vehicle. They further alleged the flashing light was placed immediately south of the bridge on the downward slope leading away from the bridge, but immediately north of the floodwater. They then alleged the improper placement of the light and failure to provide warning devices conforming to the Uniform Manual. The allegations are sufficient to establish that there was a failure to exercise ordinary care and that failure was a proximate cause of the accident which resulted in the injury.

The trial court should be reversed and this cause should be remanded.